UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRUSTEES OF THE UPSTATE NEW
YORK ENGINEERS PENSION FUND,

                    Plaintiff,

        v.

IVY ASSET MANAGEMENT,
LAWRENCE SIMON, HAROLD WOHL,
AND BANK OF NEW YORK MELLON
CORPORATION,

                    Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___9/16/15___

**MEMORANDUM
OPINION & ORDER**

13 Civ. 3180 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

The Board of Trustees of the Upstate New York Engineers Pension Fund brings this action pursuant to Section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, against Defendants Ivy Asset Management, Lawrence Simon, Harold Wohl, and Bank of New York Mellon Corporation. Plaintiff alleges that Defendants failed to properly advise Plaintiff regarding the Pension Fund's investment in Bernard Madoff's now notorious Ponzi scheme after Defendants discovered information that caused them to believe that the investment was no longer prudent. Plaintiff seeks to recover alleged losses associated with Defendants' alleged breach of fiduciary duty and the disgorgement of profits that Defendants Simon and Wohl allegedly realized as a result of placing Plaintiff's assets at risk. Defendants have moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P 12(b)(1) and 12(b)(6).

## BACKGROUND[1]

### I.    THE PARTIES

Plaintiff is the Board of Trustees (the "Trustees") of the Upstate New York Engineers Pension Fund ("Pension Fund") and the named fiduciary of the Pension Fund under 29 U.S.C. § 1102(a)(2). (Am. Cmplt. (Dkt. No. 29) ¶ 4) The Pension Fund is a Taft-Hartley Trust and a multi-employer plan under 29 U.S.C. § 1002(37)(A). (Id.) The Pension Fund is the successor to the Engineers Joint Pension Fund (the "Plan"), which consisted of several local unions of the International Union of Operating Engineers. (Id.) At all relevant times, the Trustees made investments on behalf of the Plan. (See id. ¶ 5)

Defendant Ivy Asset Management ("Ivy") is a Delaware limited liability company with its principal place of business in New York. (Id. ¶ 5) Ivy is a registered investment adviser under the Investment Advisers Act of 1940 (id.), and provides three core services: (1) managing proprietary funds that are marketed as limited partnerships; (2) managing the assets of high net worth individuals and institutional clients, and creating individual proprietary funds over which Ivy has discretion; and (3) rendering investment advice to other investment advisers, ERISA covered employee benefit plans, and asset managers. (Id. ¶ 13) Beginning in 1990, Ivy entered into a written agreement with Plaintiff whereby Ivy served as an investment manager and provided investment advice to the Trustees. (Id. ¶ 5) Ivy continued in this role until 2009. (Id. ¶ 5)

In 2000, Ivy was acquired by the Bank of New York Mellon (the "Bank"). (Id.) The Bank is a Delaware corporation with its headquarters in New York. (Id. ¶¶ 5, 8)

---

[1]  The facts set forth in this opinion are drawn from the Amended Complaint. Plaintiff's factual allegations are presumed true for purposes of resolving Defendants' motion to dismiss. See Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

Defendants Lawrence Simon and Howard Wohl formed Ivy in 1984. (Id. ¶¶ 6, 7) Simon served as Ivy's president and chief executive officer from 1984 to 2005, and as vice chairman from 2006 until 2008. (Id.) Wohl served as Ivy's vice president and chief investment officer from 1984 to 2005, and as vice chairman from 2006 until 2008. (Id. ¶ 7) Pursuant to the written agreement between Ivy and the Trustees, Simon and Wohl provided investment advice to the Trustees regarding the Plan's assets, as well as "individualized recommendations of particular investment managers for the investment of the Plan's assets." (Id. ¶¶ 6-7) Ivy collected fees in exchange for providing this advice. (Id.) When the Bank acquired Ivy in 2000, it purchased Simon and Wohl's shares in Ivy for $50 million each, with an earn-out provision that ultimately yielded each man an additional $50 million. (Id.) Accordingly, Simon and Wohl each earned $100 million as a result of the Bank's acquisition of Ivy.

## II.    IVY'S INITIAL CONTACT WITH MADOFF

In the summer of 1987, a client introduced Simon and Wohl to Bernard Madoff. (Id. ¶ 14) Madoff operated Bernard L. Madoff Investment Securities LLC ("BMIS"). (Id. ¶ 9) In October 1987, Simon and Wohl made an investment with Madoff through one of Ivy's proprietary funds. (Id. ¶ 14) Ivy maintained several of these investments until it closed its account in 2000. (Id.)

Madoff explained to Simon and Wohl that he utilized a "split-strike conversion strategy," which involved buying and selling Standard & Poor's 100 Index ("OEX") options to effectuate trades and earn high rates of return on investments. (Id. ¶ 51) Madoff said that his trading strategy involved "the purchase of a basket of common stocks with the simultaneous

3

sale of an index call option and purchase of a put option."[2]  (Id. ¶ 44)  In reality, Madoff

conducted no actual trading, and his investment business was an enormous Ponzi scheme.  (Id. ¶

10)  Madoff generated account statements that purported to show the value of an investor's

account, but the stated values were entirely fictitious.  See id. ¶¶ 45, 153.

## II.     The Investment Management Agreement Between Ivy and the Trustees and the Plan's Madoff Investments

In November 1989, Ivy made a presentation to the Trustees regarding its

investment advisory services.  (Id. ¶ 15)  Ivy proposed that the Plan invest in one of "Ivy's

limited partnership proprietary funds that engaged in convertible arbitrage with different

investment managers, including Madoff . . . ."  (Id. ¶ 18)  On the recommendation of John

Jeanneret, an investment consultant to the Trustees (id. ¶ 17), the Trustees declined to invest in

an Ivy proprietary limited partnership.  (Id. ¶ 19)  Ivy then proposed that the Plan make an

investment in BMIS directly.  (Id. ¶ 20)  After consulting with Ivy and meeting with Madoff in

1990, Jeanneret recommended to the Trustees that the Plan invest directly in BMIS.  (Id. ¶ 21)

In April 1990, the Trustees and Ivy entered into a Discretionary Investment

Management Agreement ("1990 DIMA") (id. ¶ 22; see id., Ex. 1), which provided that Ivy was

a fiduciary to the Plan and that it had the discretion to invest the Plan's assets directly, or to

select investment advisers to make such investments.  (Id. ¶ 23; see id., Ex. 1 at 2)  Ivy

acknowledged that it was a fiduciary to the Plan and agreed to carry out its responsibilities

---

[2] "[S]plit-conversion hedged option transactions . . . [are] defined as the purchase of a basket of
common stocks, typically with the simultaneous sale of an index call option and purchase of a
put option.  In each case, the expiration date of the call option and the put option [are] identical.
All such transactions [are] undertaken on a hedged basis, such that the basket of stocks
purchased . . . correlate significantly with the underlying index."  (Am. Cmplt. (Dkt. No. 29),
Ex. 2 at 22 (Investment Guidelines))

4

under the 1990 DIMA consistent with ERISA and in accordance with the Trustees' investment guidelines. (Id. ¶ 24) Under the Trustees' investment guidelines, Ivy was required to pursue "a conservative investment policy, . . . with the primary objective being preservation of capital . . . [and the] achievement of the maximum possible investment return consistent with th[is] primary objective." (Id., Ex. 1 at 14) Under the 1990 DIMA, Ivy was paid a base fee and a performance fee by the Plan. (Id. ¶ 26; see id., Ex. 1 at 9)

In May 1990, Ivy invested $4,997,786.02 of the Plan's assets with BMIS. (Id. ¶ 27) In April 1991, the Trustees – on Ivy's recommendation – invested an additional $5,014,706.21 of the Plan's assets with Madoff. (Id. ¶ 28)

In June 1992, the Trustees – on Ivy's recommendation – invested an additional $2 million with Madoff. (Id. ¶ 34) By April 1994, the stated value of the Plan's investment with Madoff was approximately $22 million. (Id. ¶ 35)

In April 1994, Ivy entered into a new Discretionary Investment Management Agreement ("1994 DIMA") with the Plan. See 1994 DIMA (Dkt. No. 29), Ex. 2. The 1994 DIMA provided that Ivy was a fiduciary to the Plan and would serve as the Plan's investment manager. (Am. Cmplt. (Dkt. No. 29) ¶ 37) In the 1994 DIMA, Ivy agreed to (1) select and recommend investment advisers; and (2) supervise and direct the investment of the Plan's assets in accordance with the Trustees' investment guidelines, the Plan's current funding policy, and the terms of the 1994 DIMA. (Id. ¶ 39) The investment guidelines directed Ivy to pursue a conservative investment strategy. (Id. ¶ 40)

The 1994 DIMA also appointed Ivy as the Trustees' attorney-in-fact, allowing it to appoint investment advisers to invest and re-invest Plan assets. (Id. ¶ 38) The 1994 DIMA again provided for a two-tiered compensation structure, consisting of a base fee and a

5

performance fee.  (Id. ¶ 41)  The performance of the Plan's investment with Madoff was linked directly to the allocation of performance fees.  (Id.)

In December 1994, on Ivy's recommendation, the Plan withdrew $1.5 million from its investment with Madoff.  (Id. ¶ 47)  In June 1996, the Plan invested an additional $1 million with Madoff.  (Id. ¶ 49)

Between 1994 and 1996, Ivy made presentations and issued reports to the Trustees regarding the Plan's investment strategy, portfolio composition, and/or investment diversification.  (Id. ¶¶ 45, 48)  The reports reflected the stated value of the Plan's investment with Madoff.  (Id.)  "At no time did Ivy tell the . . . Trustees of any concerns about Madoff." (Id. ¶ 48)

Throughout 1997, Ivy continued to issue investment reports to the Trustees. (Id. ¶ 63)  In June of 1997, Ivy advised the Trustees to withdraw $359,943 from the Plan's Madoff investment.  (Id. ¶ 64)  In March 1998, Ivy advised the Trustees to withdraw another $7 million from the Plan's Madoff investment.  (Id. ¶ 66)  As of December 1998, the Plan's investment with Madoff had a stated value of $36,629,757.  (Id. ¶ 83)

Between January and April 1999 – on Ivy's recommendation – the Trustees invested an additional $6.3 million with Madoff.  (Id. ¶ 95)

### III.    Ivy's Concerns About Madoff's Alleged Trading Strategy

In early 1997, Ivy discovered information about Madoff that caused it concern about his investment strategy.  (Id. ¶ 50)  Madoff had initially explained to Simon and Wohl that he purchased and sold OEX options traded on the Chicago Board Options Exchange ("CBOE").  (Id. ¶ 52)  A key component of Madoff's split-strike strategy was the ability to buy OEX options in large volume.  (Id. ¶ 51)  However, Wohl and Ivy's chief of investment

6

management discovered that the total amount of OEX options traded on the CBOE could only support approximately $1 billion of Madoff's alleged split-strike conversion strategy, and Ivy believed that if Madoff was actually engaged in trading, he would require a much greater amount of OEX options. (Id. ¶ 53) Accordingly, Wohl became suspicious that Madoff was not actually trading as he claimed. (Id.) Wohl directed Ivy employees to investigate his concerns. (Id. ¶ 54)

In May 1997, Ivy's investment chief contacted another hedge fund manager who had invested with Madoff. (Id. ¶ 55) This individual echoed Ivy's concerns, and relayed additional "facts that suggested that Madoff was falsifying his performance returns and giving investors a 'managed return stream.'" (Id. ¶ 56) A few days later, Ivy's investment chief compared the options that Madoff had supposedly bought for Ivy's clients' accounts with the total volume of options traded on the CBOE that day. (Id. ¶ 57) He concluded that there were not "enough options traded on the CBOE . . . to support Madoff's supposed trades for Ivy's clients, much less the assets invested with Madoff by other clients and feeder funds." (Id.) Ivy's investment chief also found that Madoff purported to have executed trades at more favorable prices than any of the actual prices of CBOE trades reported that day. (Id.)

On May 20, 1997, Ivy's investment chief wrote to Wohl and Simon expressing his concerns regarding Madoff. (Id. ¶ 59) He suggested that Madoff might be using investors' money "as a subordinated lender to his market making business, and that the investment returns Madoff reported for those accounts included compensation for Madoff's use of their money." (Id.)

In June 1997, Simon asked Madoff whether it was possible to trade options in excess of what was reported on the CBOE on a particular day. (Id. ¶ 60) Madoff said that it

was "rare and not normal for him to trade options at greater [volume] than the exchange reports." (Id. ¶ 61) He also told Simon that he traded "very small" amounts of OEX options on foreign exchanges, however, and that a few banks had "written options contracts in excess of what is reported on the exchange[.]" (Id.) Madoff's explanation did not explain the discrepancy between the options trades Madoff reported to clients and the volume of options trades on the CBOE. (Id. ¶ 62)

In December 1998, Madoff offered Ivy a different explanation as to where he bought and sold the options used in his split-strike strategy. (Id. ¶¶ 67-68) Madoff claimed that "50-75% of the index options were traded with major counterparties off the exchange." (Id. ¶ 68) Madoff also explained that "his ability to execute trades efficiently and at the best price" was the key to his success using the split-stock strategy. (Id. ¶ 69)

In February 1998, Madoff told Ivy that the key to his success in using the split-strike conversion strategy was market timing and volatility analysis. (Id. ¶ 65) Madoff later admitted to Ivy that he was not, in fact, an expert market timer, as he had claimed. (Id. ¶ 69; see id. ¶ 65)

Madoff's inconsistent representations regarding his trading strategy gave Wohl "great concern." (Id. ¶ 70) In a December 16, 1998 email to senior Ivy personnel Wohl stated:

> I am concerned that he now admits that he does not execute all of the index options on the exchange that there are 'unknown' counterparties that if these options are not paid off he'd lose less than 100%
> It remains a matter of faith based on great performance – this doesn't justify any investment, let alone 3%

(Id., Ex. 3; see also id. ¶ 71)

In reply, Simon wrote:

> Amount we now have with Bernie in Ivy's partnerships is probably less than $5 million. The bigger issue is the $190 mill or so that our relationships have with

8

him which leads to two problems, we are on the legal hook in almost all of the relationships, and the fees generated are estimated based on 17+% returns are as follows:

Engineers $ 35 mill    $510K x 2/3 = $340K
Beacon      30 mill    $400K x 1/2 = 200K
Jeanneret  100 mill    $950K x 1/2 = 475K
Remaining 35 mill Fair Share Guess 200K (Income Plus, Andover, Regency, etc.)
Grand Total                $1.275 Million

Are we prepared to take all the chips off the table, have assets decrease by over $300 million and our overall fees reduced by $1.6 million or more, and, one wonders if we ever "escape" the legal issue of being the asset allocator and introducer, even if we terminate all Madoff related relationships?

(Id., Ex. 4; see also id. ¶ 73)

In a December 17, 1998 email, Ivy's chief investment manager suggested a

"middle of the road" approach:

I think the time has come for Ivy to resolve this question and to set a policy we can all be comfortable with. Let me propose that we do the following: Terminate all [Madoff] investments for the Ivy funds (the $5 mil or so) Write to the advisory clients telling them we have done so and the reasons why. Then leave the rest up to them.

Here are my reasons:

Legally, we will of course still have liability as investment advisor, particularly for the ERISA entities, but we will have insulated ourselves from liability as GP of our funds.

I imagine that our letters to clients would serve to at least partially exculpate Ivy should the worst happen. We have said that it is important to maintain at least some level of Ivy fund investments with Madoff in order to send a message to the advisory clients that we have confidence in [Madoff] (as well as in the other managers we recommend to them). However, in view of Howard's deep concerns (which I share, though not to the same extent), Ivy should perhaps no longer express the same vote of confidence in Madoff. Full withdrawals from the Ivy funds would send a very clear message to the clients regarding Ivy's concerns about this investment.

If some clients decide to withdraw based on Ivy's withdrawals from our own funds, we would have to be prepared to accept that. Would the Engineers,

Jeanneret and the others walk away from Madoff if Ivy withdraws its money? I'm not sure, but I doubt it. Based on the amounts of capital they have invested with [Madoff], my perception is that they are quite satisfied with Madoff and would not want to leave. In the case of Jeanneret, he hardly listens to our advice at all, and our pleas to the Engineers for more diversification have for the most part fallen on deaf ears.

It's somewhat of a middle of the road approach, but I think it enables us to preserve the majority of the fees while reducing our legal risk.

(Id., Ex. 5; see also id. ¶ 75) The approach suggested by Ivy's chief investment manager was not adopted. Ivy did not close its account with Madoff but instead limited Ivy proprietary funds' investments with Madoff to no more than 3% of assets. (Id. ¶ 76) Simon and Wohl also did not advise their clients or Jeanneret about their concerns regarding Madoff. (Id.)

## IV.   IVY'S 1998-99 COMMUNICATIONS WITH PLAINTIFF CONCERNING MADOFF

During a December 30, 1998 meeting with Ivy, the Trustees informed Simon and Wohl that they wanted "to eliminate three of the six managers Ivy had recommended and shift the assets invested with these [three] managers to Madoff." (Id. ¶ 78; see also id. ¶ 77) At that time, more than 3% of the Plan's assets were invested in Madoff. (Id. ¶ 78) In response, Simon recommended that the Trustees increase the Plan's Madoff investment by a smaller amount than what the Trustees had proposed. (Id.) Simon explained that the large increase proposed by the Trustees "would result in undue concentration in a single manager." (Id.) Simon also expressed several concerns about Madoff, including his "age, the fact that no other entity had been able to replicate his results, and the fact that he had custody of the securities and that his accountant was not a substantial accounting firm." (Id. ¶ 79) The Trustees were already aware of these facts (id.), but nonetheless asked whether – given Ivy's concerns – the Plan should continue to invest with Madoff. (Id. ¶ 81)

10

Simon assured the Trustees that there was no reason to terminate the Plan's investment with Madoff, but suggested that the Trustees limit the amount of the proposed increase. (Id. ¶ 86) Simon did not mention to the Trustees any of the concerns about Madoff that had been discussed internally at Ivy. (Id. ¶ 80) Indeed, Simon told the Trustees that "Ivy's due diligence had revealed no problems with Madoff." (Id. ¶ 87) Simon emphasized, however, that "Ivy tends not to have more than 5%-7% with any[ ]one manager." (Id.)

In a January 12, 1999 letter to the Trustees, Simon addressed the Plan's continued investment in Madoff:

> I'd like to take this opportunity to clarify and expand on some of the points regarding Bernard L. Madoff's strategies. Over a period of more than 11 years, Ivy has considered, reviewed, analyzed and performed due diligence regarding the Madoff firm and the strategies employed. We have no reason to believe that the Madoff account is anything other than what Ivy's experience has shown and what the record demonstrates it to be. In response to a question from trustee Burns, we noted that, due to a lack of external corroborative evidence, we cannot "close the loop" in a manner that gives us total comfort. This is due to aspects of this investment manager's operations and Ivy's philosophy, which include:
>
> - There is no separate custodial function for the securities that Madoff buys and sells.
>
> - Ivy's philosophy for the last fifteen years has been and continues to be that we recommend limiting investments (generally between 8 and 15%, depending on circumstances) to any manager in Ivy's roster of alternative investment managers. We acknowledge that a number of our advisory clientele have chosen to ignore Ivy's recommendations regarding concentration limits.
>
> In view of the foregoing, we believe that the Madoff allocation should not be as large as the trustees originally proposed at their last Trustee meeting in December.

(July 14, 2014 Choe Decl. (Dkt. No. 32), Ex. 2; see Am. Cmplt. (Dkt. No. 29) ¶¶ 88-90)

In response to Simon's letter and Ivy's recommendation that the Plan's exposure to Madoff be limited to no more than 15% of Plan assets, the Trustees amended the investment

guidelines that governed Ivy's investment of Plan assets.  (Id. ¶¶ 90, 91)  Under the amended guidelines, no individual investment made by Ivy could exceed $50 million.  (Id.)

In 1999, Ivy continued to make presentations at Trustee meetings and to issue reports to the Trustees regarding the Plan's investments, including the Madoff investment.  (Id. ¶ 101)  At no time in 1999 did Ivy indicate anything "improper about Madoff's operation."  (Id. ¶ 103)  In 1999, the Trustees paid Ivy $543,000 in performance fees in connection with the Madoff investment.  (Id. ¶ 105)

## V.   THE PLAN'S INCREASED PAYMENTS TO PLAN PARTICIPANTS

In 1998 and 1999, in light of the reported value of the Plan's Madoff investment, the Trustees considered increasing Plan retirement benefits.  (Id. ¶¶ 93, 94, 97)  In September 1998, the Plan's actuary produced an actuarial valuation report demonstrating that the Plan could afford to do so.  (Id. ¶ 94)  The report analyzed (1) the market value of the Plan's assets; (2) the ratio of assets to the present value of vested benefits; (3) the ratio of assets to the present value of total accumulated plan benefits; and (4) projected investment performance.  (Id.)  All of these calculations were impacted by the stated value of the Plan's Madoff investment.  (Id.)  On July 29, 1999, the Trustees amended the Plan to increase pension benefits.  The changes were made retroactive to April 1, 1998.  (Id. ¶ 97)

The Plan amendments increased monthly pension vesting credit "from 1.8% to 3.3% of contributions made on behalf of a participant during a given [P]lan year."  (Id. ¶ 97)  The amendments also provided certain pensioners with a one-time bonus payment during the Plan year, beginning on April 1, 1999.  (Id.)  Payments ranged from $260 to $1,460.  (Id.)  Once the benefits vest, the pension credit increase cannot be reduced.  (Id. ¶ 98)

12

## VI.    THE BANK'S 2000 ACQUISITION OF IVY

In 2000, the Bank became interested in acquiring Ivy because of its "roster of high net worth individual investors and its ERISA covered employee benefit plan client base." (Id. ¶¶ 107-08) Negotiations between Ivy and the Bank continued for approximately thirteen months. (Id. ¶ 197) During these negotiations, the Bank reviewed Ivy's assets under management, including the Madoff investments. (Id. ¶ 198) During the review, Ivy informed the Bank that Ivy intended to liquidate its Madoff investment and reinvest the proceeds in an alternative investment. (Id. ¶ 199) Ivy later liquidated its proprietary funds' entire investment with Madoff. (Id. ¶ 113) However, "to avoid suspicion and protect the income stream . . . generated from outside investments in Madoff," Simon and Wohl falsely represented to Jeanneret that Madoff had insisted that Ivy liquidate its Madoff investment based on a conflict of interest. (Id. ¶ 114) Ivy also stated that restrictions imposed by Madoff prevented it from performing due diligence on the Plan's Madoff investment. (Id. ¶¶ 116-17)

As a result of the Bank's 2000 acquisition of Ivy,[3] Simon and Wohl each made $100 million. (Id. ¶ 112; see id. ¶¶ 6, 7) They also became Bank employees, reporting directly to the Bank's Board of Directors. (Id. ¶ 200) The Bank thereafter received income generated from advisory fees that the Plan paid to Ivy. (Id. ¶ 201)

At some point after the Ivy acquisition, the Bank was informed that (1) Ivy was concerned that there were insufficient options traded on the CBOE to support the volume of Madoff's alleged trading; (2) Madoff had made inconsistent statements to Ivy regarding his trading strategy; and (3) Ivy was instructing clients to liquidate their Madoff investments, and was refusing to place the assets of new clients with Madoff. (Id. ¶ 202)

---

[3] The Amended Complaint does not disclose when in 2000 the acquisition took place.

13

In 2005, the Bank formed an internal Global Risk Committee to address and assess Ivy's business risks. (Id. ¶ 203) In 2005, this Committee identified Ivy's exposure to Madoff as its fourth highest risk (id. ¶ 204), and in 2007 the Committee identified Ivy's Madoff investments as one of Ivy's top risks. (Id. ¶ 206) These conclusions were never conveyed to the Trustees. (Id. ¶¶ 205, 207)

In 2000, Ivy continued to make presentations to the Trustees and to issue reports to the Trustees concerning the Plan's Madoff investment. (Id. ¶ 118) At no time in 2000 did Ivy or the Bank advise the Trustees or Jeanneret that the Madoff investment was no longer prudent, or that the Plan should liquidate its Madoff investment. (Id. ¶¶ 110, 120)

Based on Ivy's recommendation, the Trustees withdrew $7 million from the Madoff investment in March 2000. (Id. ¶ 119) In 2000, the Trustees paid Ivy $310,000 in performance fees that were linked directly to the Plan's Madoff investment. (Id. ¶ 122)

## VII.   IVY DISCLOSES ITS CONCERNS ABOUT MADOFF TO OTHER CLIENTS

In October 2001, Ivy informed one of its clients that Ivy's proprietary funds had liquidated their Madoff investments because Ivy "had concluded that a continued investment [with Madoff] had become imprudent." (Id. ¶ 124) The client thereafter directed Ivy to liquidate its Madoff investment. (Id. ¶ 125) In January 2002, Ivy and the Bank began to advise other clients to liquidate their Madoff investments, based on concerns that a continued investment with Madoff was no longer prudent. (Id. ¶ 132) During this time, Ivy also "told a potential investor that it would be inconsistent with Ivy's fiduciary responsibility to place the investors' money into a Madoff Investment." (Id. ¶ 133) That same year, Ivy and the Bank rejected a proposal that one of Ivy's proprietary funds invest with Madoff. (Id. ¶ 138)

14

Between 2001 and December 2008, Ivy continued to make presentations to the Trustees and to issue reports to the Trustees concerning the Plan's Madoff investment. (Id. ¶¶ 126, 139, 150) Ivy and the Bank did not advise the Trustees during this period that it was not prudent to maintain the Madoff investment, nor did Ivy and the Bank recommend to the Trustees that the Plan liquidate its Madoff investment. (Id. ¶¶ 128, 142, 146) The Trustees continued to pay performance fees to Ivy and the Bank that were directly linked to the Madoff investment. (Id. ¶¶ 130, 144, 148) Between 2001 and 2007, the Trustees paid Ivy $952,000 in performance fees. (Id.)

In January 2002, the statements relating to the Plan's Madoff investment indicated that that investment had a value of $51,466,764. (Id. ¶ 134) Based on Ivy's recommendation, the Trustees withdrew $6 million from the Plan's Madoff investment in March 2002. (Id. ¶ 137) Between December 2002 and December 2005, the Trustees withdrew an additional $27 million from the Plan's Madoff investment. (Id. ¶¶ 140, 151)

## VIII.  MADOFF'S ARREST AND SUBSEQUENT LEGAL PROCEEDINGS

On December 11, 2008, Madoff was arrested and the Defendants and the Trustees learned for the first time that Madoff had been operating a Ponzi scheme. (Id. ¶¶ 10, 153) At that time, the stated value of the Plan's Madoff investment was $51,473,794. (Id. ¶ 10) "This revelation immediately caused over $50 million in Plan assets to lose all value." (Id. ¶ 154; see id. ¶ 10)

On February 5, 2009, the United States Department of Labor ("DOL") issued guidance to the trustees of ERISA employee benefit plans that had invested with Madoff. (Id. ¶ 159) DOL recommended that trustees "take steps to assess and protect the interest of each plan and its participants, and . . . determine whether any third party was responsible for any losses to

15

the plan stemming from Madoff investments and if appropriate[,] take action against such third

parties." (Id. ¶ 159 (citing id., Ex. 6))

On April 9, 2009, DOL issued a subpoena to the Trustees relating to the Plan's

Madoff investment. (Id. ¶ 157) On August 13, 2009, the New York Attorney General issued a

subpoena to the Trustees relating to the Plan's Madoff investments. (Id. ¶ 158)

On November 12, 2010, the bankruptcy trustee for BMIS filed an adversary

proceeding against the Plan, seeking to "claw back" $32,974,971 that the Plan had obtained

from its Madoff investment. (Id. ¶ 155) This amount represents "the amount of withdrawals

[that] the Plan had made from the Madoff [i]nvestment . . . over and above the deposits the Plan

had made . . . ." (Id.) In other words, the bankruptcy trustee sought to claw back the Plan's

profits.[4]

---

[4] The parties agree that the table set forth below accurately reflects the Plan's net investment
and transactions in its Madoff investment account between June 27, 1997 and December 30,
2005:

| DATE | TRANSACTION | NET INVESTMENT |
|------|-------------|----------------|
| 6/27/1997 | *withdrew $359,993* | $12,725,258 |
| 3/27/1998 | *withdrew $7,000,000* | $5,725,258 |
| 1/5/1999 | invested $2,300,000 | $8,025,258 |
| 4/1/1999 | invested $4,000,000 | $12,025,258 |
| 3/30/2000 | *withdrew $7,000,000* | $5,025,258 |
| 9/29/2000 | *withdrew $5,000,000* | $25,258 |
| 3/28/2002 | *withdrew $6,000,000* | *$5,974,742 in profits* |
| 12/31/2002 | *withdrew $3,000,000* | *$8,974,742 in profits* |
| 6/27/2003 | *withdrew $10,000,000* | *$18,974,742 in profits* |
| 12/31/2004 | *withdrew $7,000,000* | *$25,974,742 in profits* |
| 12/30/2005 | *withdrew $7,000,000* | *$32,974,742 in profits* |

See April 30, 2014 transcript of oral argument (Dkt. No. 57) at 16; Def. Br. (Dkt. No. 33)
"Madoff Transaction Table" at 5.

16

## IX.    PLAINTIFF'S BREACH OF FIDUCIARY DUTY CLAIMS

### A.    Claims Against Ivy, Simon, and Wohl

Plaintiff asserts three causes of action against Ivy, Simon, and Wohl for breach of fiduciary duty in violation of Section 404 of ERISA, 29 U.S.C. § 1104.  Plaintiff alleges that these Defendants breached their duty of prudence (Count I), duty of loyalty (Count II), and duty to administer the Plan in accordance with its governing documents and instruments (Count III). (Id. ¶¶ 160-195)  Plaintiff contends that Ivy, Simon, and Wohl violated these duties by (1) not informing the Trustees in December 1998 that they had concluded that it was not prudent to continue to invest with Madoff; and (2) not advising the Trustees to liquidate the Plan's Madoff investment.  (Id. ¶¶ 163, 173, 175, 188)  Plaintiff claims that these Defendants violated their duties to Plaintiff in order to ensure (1) their continued receipt of advisory fees; and (2) that the Bank's acquisition of Ivy would proceed.  (Id. ¶ 174)  With respect to Count III, Plaintiff contends that Ivy, Simon, and Wohl violated their obligation under the Trustees' investment guidelines to adopt "a conservative investment policy, with the primary objective being the preservation of capital" and the "achievement of the maximum possible investment return consistent with the . . . primary objective."  (Id., Ex. 1 at 16; id. ¶ 184)  Plaintiff claims that by 1998, Ivy, Simon, and Wohl knew or should have known that continuing to invest with Madoff was no longer consistent with the investment guidelines.  (Id. ¶ 186)

Pursuant to 29 U.S.C. § 1109, Plaintiff seeks to recover from Defendants Ivy, Simon, and Wohl losses stemming from the alleged fiduciary breach of the duties of prudence and loyalty, as well as the duty to administer the Plan in accordance with the 1994 Investment Guidelines.  (Id. ¶¶ 168-69, 180-81, 193-94)  Plaintiff also alleges that under 29 U.S.C. § 1109,

17

Defendants Simon and Wohl "must disgorge to the Plan the $100 million each received" from the Bank's acquisition of Ivy.  (Id. ¶¶ 170, 182, 195)

## B.    Claims Against the Bank

In Count IV of the Amended Complaint, Plaintiff claims that the Bank knowingly participated in Ivy, Simon, and Wohl's breach of their fiduciary duty to the Plan. (Id. ¶¶ 196-209)  Plaintiff contends that the Bank knew that Ivy, Simon, and Wohl had breached their fiduciary duties to the Plan, and that that Bank "acquiesced in those breaches."  (Id. ¶ 208) Plaintiff claims that the Bank's acquiescence in its co-defendants' breaches, and the Bank's receipt of investment advisory fees paid by the Plan, renders the Bank jointly and severally liable.  (Id. ¶ 209)

## X.    PROCEDURAL HISTORY

This action was filed on May 10, 2013 (Dkt. No. 1), and was assigned to the Honorable Lewis A. Kaplan.  (Dkt. No. 2)  On August 2, 2013, Defendants moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  (Dkt. No. 10)  On April 30, 2014, Judge Kaplan heard oral argument concerning the motion to dismiss.  See April 30, 2014 Oral Argument Tr. (Dkt. No. 27).  Judge Kaplan reserved decision and granted Plaintiff leave to amend the Complaint.  Judge Kaplan recommended that – in the Amended Complaint – Plaintiff "spell out, with precision, what the theories of injury are and what the facts are that they rest on[.]"  (Id. at 27-28)  On May 1, 2014, Judge Kaplan issued an order denying Defendants' motion to dismiss "without prejudice to the filing by [P]laintiff of an amended complaint and a motion addressed thereto on the basis stated on the record in open court."  (Dkt. No. 26)

18

On May 29, 2014, Plaintiff filed an Amended Complaint. (Dkt. No. 29) On July 14, 2014, Defendants moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). (Dkt. No. 31)

On February 24, 2015, the case was reassigned to this Court.

## XI.    MADOFF-RELATED CLAW BACK PROCEEDINGS

On November 12, 2010, the trustee for Bernard L. Madoff Investment Securities LLC (the "BMIS trustee") initiated an adversary proceeding against Plaintiff in Bankruptcy Court for the Southern District of New York. (Am. Cmplt. (Dkt. No. 29) ¶ 155; see Securities Investor Protection Corporation v. BLMIS, Adv. No. 08-1789, Adv. No. 10-05210 (Bankr. S.D.N.Y.)) The BMIS trustee sought to "claw back," or recover, $32,974,971 from the Plan. This sum represents the amount of money that the Plan withdrew from its Madoff account that exceeds the amount that the Plan had invested with Madoff. (Id.) In other words, the BMIS trustee sought to recover the profits that the Plan had realized from its investment with Madoff.

After Madoff's Ponzi scheme was disclosed, the Securities Investor Protection Corporation (the "SIPC") – a non-profit corporation – initiated a liquidation proceeding of BMIS, pursuant to the Securities Investor Protection Act ("SIPA"). In re Bernard L. Madoff Inv. Sec. LLC ("In re BLMIS I"), 654 F.3d 229, 233 (2d Cir. 2011).

> SIPA establishes procedures for liquidating failed broker-dealers and provides their customers with special protections. In a SIPA liquidation, a fund of "customer property," separate from the general estate of the failed broker-dealer, is established for priority distribution exclusively among customers. The customer property fund consists of cash and securities received or held by the broker-dealer on behalf of customers, except securities registered in the name of individual customers. 15 U.S.C. § 78lll(4). Each customer shares ratably in this fund of assets to the extent of the customer's "net equity." Id. § 78fff-2(c)(1)(B).

Id.

19

"Where . . . the customer property fund is not sufficient to pay customers in full,

[however,] SIPA empowers a trustee to claw back any transferred funds 'which, except for such

transfer[s], would have been customer property.'" In re Bernard L. Madoff Inv. Sec. LLC ("In

re BLMIS II"), 773 F.3d 411, 415 (2d Cir. 2014) (quoting 15 U.S.C. § 78fff-2(c)(3)). "But a

trustee can only claw back those transferred funds 'if and to the extent that [they are] voidable

or void under the provisions of' the Bankruptcy Code." Id. (quoting 15 U.S.C. § 78fff-2(c)(3))

(alterations in original).

> Under 11 U.S.C. § 546(e) of the Bankruptcy Code, a bankruptcy trustee
>
> "may not avoid a transfer that is a . . . settlement payment, as defined in
> section. . . 741 of this title, made by [a] . . . stockbroker. . . , or that is a transfer
> made by [a] . . . stockbroker . . . in connection with a securities contract, as
> defined in section 741(7), . . . except under section 548(a)(1)(A) of this title."

Id. at 417 (quoting 11 U.S.C. §546(e)) (alterations in original).

> Under 11 U.S.C. § 548(a)(1),
>
> [t]he trustee may avoid any transfer . . . of an interest of the debtor in property, or
> any obligation . . . incurred by the debtor, that was made or incurred on or within
> 2 years before the date of the filing of the petition, if the debtor voluntarily or
> involuntarily –
>
> > (A) made such transfer or incurred such obligation with actual
> > intent to hinder, delay, or defraud any entity to which the
> > debtor was or became, on or after the date that such transfer
> > was made or such obligation was incurred [or] indebted . . . .

11 U.S.C. § 548(a)(1)(A).

The Second Circuit has addressed whether Madoff customers, like Plaintiff, are

entitled to keep profits realized from investments with Madoff. See In re BLMIS II, 773 F.3d

411. The court concluded that "[Section] 546(e) shields [the] [withdrawal] transfers from

avoidance because they were 'made in connection with a securities contract,' and were also

'settlement payment[s].'" Id. at 417. Accordingly, to the extent that a Madoff investor made

withdrawals from its Madoff account more than two years before the BMIS bankruptcy petition
was filed, those payments are not subject to claw back under Sections 546(e) and 548(a)(1) of
the Bankruptcy Code. Id. at 423.

Here, Plaintiff withdrew $32,974,971 in Madoff-related profits more than two
years before the BMIS bankruptcy petition was filed. See Am. Cmplt. (Dkt. No. 29) ¶¶ 151,
153; Securities Investor Protection Corporation v. BLMIS, Adv. No. 06-1789, Adv. No. 10-
05210 (Dkt. No. 1) (Bankr. S.D.N.Y.). The parties agree that Plaintiff is entitled to retain the
$32,974,971 in profits that the Plan realized from its Madoff investment. (Pltf. Ltr. (Dkt. No.
39); Def. Ltr. (Dkt. No. 38))

## XII.   DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

Defendants Ivy, Simon, and Wohl move to dismiss Plaintiff's claims against
them (see Am. Cmplt. (Dkt. No. 29), Counts I, II, and III) on the grounds that Plaintiff has not
sustained an actual injury sufficient to establish Article III standing or to plead a cause of action
under ERISA. (Def. Br. (Dkt. No. 33) at 11)  Defendant Bank of New York Mellon moves to
dismiss Plaintiff's claim against it (see Am. Cmplt. (Dkt. No. 29), Count IV) for failure to state
a claim under Fed. R. Civ. P. 12(b)(6). (Def. Br. (Dkt. No. 33) at 26)

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   Rule 12(b)(1) Standard

"Article III of the Constitution limits the jurisdiction of federal courts to the
resolution of 'cases' and 'controversies.'" W.R. Huff Asset Mgmt. Co., LLC v. Deloitte &
Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008) (quoting U.S. Const. art. III, § 2). "In order to
ensure that this 'bedrock' case-or-controversy requirement is met, courts require that plaintiffs

establish their 'standing' as 'the proper part[ies] to bring' suit." Id. (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997); citing DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006)).

"There are three Article III standing requirements: (1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct at issue; and (3) the injury must be likely to be redressed by a favorable decision." Kendall v. Emps. Ret. Plan of Avon Products, 561 F.3d 112, 118 (2d Cir. 2009) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). "The injury in fact required to support constitutional standing is 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" Donoghue v. Bulldog Investors Gen. P'ship, 696 F.3d 170, 175 (2d Cir. 2012) (quoting Lujan, 504 U.S. at 560-61 (internal quotation marks and citations omitted)); accord W.R. Huff Asset Mgmt. Co., 549 F.3d at 106; see also Lujan, 504 U.S. at 560 (In order to establish standing, "the plaintiff must have suffered an 'injury in fact'– an invasion of a legally protected interest which is . . . concrete and particularized[.]") (citations omitted); Vt. Agency of Natural Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 773 (2000) ("Congress can[] define new legal rights, which in turn will confer standing to vindicate an injury caused to the claimant.") (citing Warth v. Seldin, 422 U.S. 490, 500 (1975)). "As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing that [it] has suffered a concrete injury, or is on the verge of suffering one." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005) (citing Lujan, 504 U.S. at 561).

"Although standing is a fundamental jurisdictional requirement, it is still subject to the same degree of proof that governs other contested factual issues." Baur v. Veneman, 352 F.3d 625, 631 (2d Cir. 2003) (citing Lujan, 504 U.S. at 561). Accordingly, when "ruling on a

22

motion to dismiss for want of standing," this Court "must accept as true all material allegations

of the complaint, and must construe the complaint in favor of the complaining party." Warth,

422 U.S. at 501 (citing Jenkins v. McKeithen, 395 U.S. 411, 421 (1969)). "[S]tanding

allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of

injury." Baur, 352 F.3d at 631 (citing Lujan, 504 U.S. at 561). However, "if an injury is too

abstract, the plaintiff's claim may not be capable of, or otherwise suitable for, judicial

resolution." Id. at 632 (citing Raines, 521 U.S. at 819).

## B.   Rule 12(b)(6) Standard

A Rule 12(b)(6) motion challenges the legal sufficiency of the claims asserted in

a complaint. "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,

570 (2007)). These factual allegations must be "sufficient 'to raise a right to relief above the

speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)

(quoting Twombly, 550 U.S. at 555). As with a Rule 12(b)(1) motion, "[i]n considering a

motion to dismiss . . . the court is to accept as true all facts alleged in the complaint[,]" Kassner

v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of

N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all

reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45,

51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of

'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and

does not provide factual allegations sufficient "to give the defendant fair notice of what the

claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,

507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

"When determining the sufficiency of plaintiff['s] claim for Rule 12(b)(6)

purposes, consideration is limited to the factual allegations in plaintiff['s] . . . complaint, . . . to

documents attached to the complaint as an exhibit or incorporated in it by reference, to matters

of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of

which plaintiff[] had knowledge and relied on in bringing suit." Brass v. Am. Film Tech., Inc.,

987 F.2d 142, 150 (2d Cir. 1993) (citation omitted).

## C.     **Legal Standards in ERISA Actions**

Under Section 502(a) of ERISA, 29 U.S.C. § 1132, "[a] civil action may be

brought . . . by a . . . fiduciary for appropriate relief under section 1109 of this title." 29 U.S.C.

§ 1132(a)(2); see also Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 139-40 (1985)

("Section[] 502 authorize[s] . . . civil enforcement of the Act . . . . [and] identifies six types of

civil actions that may be brought by various parties.").

Under Section 409 of ERISA,

> [a]ny person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries . . . shall be
> personally liable to make good to such plan any losses to the plan resulting from
> each such breach, and to restore to such plan any profits of such fiduciary which
> have been made through use of assets of the plan by the fiduciary, and shall be
> subject to such other equitable or remedial relief as the court may deem
> appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

A plaintiff suing under ERISA must establish constitutional standing to bring the

ERISA claim. See Faber v. Metro. Life Ins. Co., No. 08 Civ. 10588 (HB), 2009 WL 3415369,

at * 3 (S.D.N.Y. Oct. 23, 2009) (citing Kendall, 561 F.3d at 118). However, "[i]n certain

24

situations, '[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'" Kendall, 561 F.3d at 118 (quoting Warth, 422 U.S. at 500 (internal quotation marks omitted)). "'[T]he standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.'" Id. (quoting Warth, 422 U.S. at 500) (alteration in original).

To establish constitutional standing under ERISA, a "[plaintiff] must allege some injury or deprivation of a specific right that arose from a violation of [the] duty [to comply with ERISA] in order to meet the injury-in-fact requirement." Kendall, 561 F.3d at 121 (citing Fin. Insts. Ret. Fund v. Office of Thrift Supervision, 964 F.2d 142, 147 (2d Cir. 1992)). "[Plaintiff] cannot claim that either an alleged breach of fiduciary duty to comply with ERISA, or a deprivation of [an] entitlement to that fiduciary duty, in and of [itself] constitutes an injury-in-fact sufficient for constitutional standing." Id.

"To state a claim for breach of fiduciary duty under ERISA, a plaintiff must allege facts which, if true, would show that the defendant acted as a fiduciary, breached its fiduciary duty, and thereby caused a loss to the plan at issue." Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 730 (2d Cir. 2013) (citing 29 U.S.C. § 1109(a); Pegram v. Herdrich, 530 U.S. 211, 225-26 (2000)). "ERISA section 409 permits a plaintiff to recover only those 'losses to the plan resulting from' the defendant's breach." In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig., 842 F. Supp. 2d 614, 655 (S.D.N.Y. 2012) (citing 29 U.S.C. § 1109(a)). However, "ERISA does not define 'loss' as that term is used in section 409." Donovan v. Bierwirth, 754 F.2d 1049, 1052

(2d Cir. 1985). "Section 409, by providing for the recovery of losses, primarily seeks to undo harm that may have been caused a pension plan by virtue of the fiduciaries' acts." Id. at 1056.

Where "plaintiffs . . . are seeking relief on behalf of their Plans, not individual relief, . . . ERISA section 502(a)(2) [is] the governing provision for the type of monetary relief that the plaintiffs are permitted to pursue." Haddock v. Nationwide Fin. Servs., Inc., 262 F.R.D. 97, 127 (D.Conn. 2009), vacated on other grounds, Nationwide Life Ins. Co. v. Haddock, 460 F. App'x 26 (2d Cir. 2012) (comparing Russell, 473 U.S. at 142-144 (Section 409 and Section 502(a)(2) of ERISA are the appropriate remedial provisions for claims seeking relief on behalf of an ERISA plan for breach of fiduciary duty), with Varity v. Howe, 516 U.S. 489, 512 (1996) (Section 502(a)(3) of ERISA is the appropriate remedial provision for parties seeking individual equitable relief for breach of fiduciary duty).

"'ERISA's central purpose is to protect beneficiaries of employee benefits plans.'" Gedek v. Perez, Nos. 12 Civ. 6051L et al. (DGL), 2014 WL 7174249, at *3 (W.D.N.Y. Dec. 17, 2014) (quoting St. Vincent Catholic Med. Ctrs. Ret. Plan, 712 F.3d at 715). However, "[t]he aim of ERISA is 'to make the plaintiffs whole, . . . not to give them a windfall.'" Henry v. Champlain Enterprises, Inc., 445 F.3d 610, 624 (2d Cir. 2006) (quoting Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130, 139 (2d Cir. 2000) (citation and internal quotation marks omitted)).

## II.  PLAINTIFF SUFFERED NO LEGALLY COGNIZABLE LOSS

### A.  Plaintiff's Claim for Fictitious Profits

Plaintiff alleges that "if Ivy had not breached its duties [by failing to fully disclose its concerns about Madoff's purported trading strategy], the Trustees would have cashed out [the full stated value of] [the Plan's] Madoff [i]nvestment in 1998 and reinvested

26

those proceed[s] in a prudent alternative investment, which would have had a greater value and return than they received from the Madoff investment." (Pltf. Br. (Dkt. No. 34) at 10)  In December 1998, the Plan's Madoff investment had a stated value of $36,629,757.  (Am. Cmplt. (Dkt. No. 29) ¶ 83)  Plaintiff's net investment at that time was only $5,725,258, however.  See Madoff Transaction Table (Dkt. No. 33) at 5.  Accordingly, Plaintiff is claiming that it has a legal entitlement to approximately $31 million in fictitious profits.

Defendants contend that Plaintiff has no legally protected interest in fictitious profits associated with its Madoff investment, and therefore has no right to recover the full stated value of its Madoff account as of December 1998.  (Def. Br. (Dkt. No. 33) at 11-15) Defendants further contend that because Plaintiff suffered no loss as a result of Defendants' alleged breach, Plaintiff has not alleged a cognizable injury-in-fact sufficient to provide a basis for Article III standing or to state a cause of action under ERISA, 29 U.S.C. §1109.

### 1.    Plaintiff May Not Recover the Fictitious Profits Reflected in its December 1998 Madoff Account Statement

In In re BLMIS I, 654 F.3d 229, the Second Circuit considered whether former Madoff customers were entitled to be reimbursed for the full stated value of their Madoff investments in the context of a SIPA proceeding.  As discussed above, in a SIPA liquidation proceeding, a customer property fund is established, with each customer to share from the fund ratably based on their "net equity."  Under SIPA, "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by . . . calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . . minus . . . any indebtedness of such customer to the debtor on the filing date . . . ."  15 U.S.C. § 78lll(11)(A)-(B).

27

In Madoff's Ponzi scheme, "[f]ictional customer statements were generated based on after-the-fact stock 'trades' using already-published trading data to pick advantageous historical prices." In re BLMIS I, 654 F.3d at 232. Many of Madoff's customers argued that – in determining net equity and thus the appropriate amount of reimbursement – "they were entitled to recover the market value of the securities reflected on their last BLMIS customer statements ([i.e.,] the 'Last Statement Method')." Id. at 233. The SIPA trustee contended, however, that net equity should be calculated using the Net Investment Method, which meant "crediting the amount of cash deposited by the customer into his or her BLMIS account, less any amounts withdrawn from it." Id. This method "limit[ed] the class of customers who have allowable claims against the customer property fund to those customers who deposited more cash into their investment accounts than they withdrew . . . ." Id. at 233; see also In re BLMIS, 424 B.R. 122, 135 (Bankr. S.D.N.Y. 2010). In other words, customers who realized a profit from their Madoff investment were entitled only to reimbursement of the money they actually invested, not to their fictitious profits. The bankruptcy court agreed that the Net Investment Method was the appropriate method, and certified an immediate appeal to the Second Circuit. See In re BLMIS I, 654 F.3d at 234.

The Second Circuit found that to reimburse Madoff customers based on the account value as stated in their customer statements – as opposed to a customer's net investment – would yield an inequitable result:

> Here, the profits recorded over time on the customer statements were after-the-fact constructs that were based on stock movements that had already taken place, were rigged to reflect a steady and upward trajectory in good times and bad, and were arbitrarily and unequally distributed among customers. These facts provide powerful reasons for the Trustee's rejection of the Last Statement Method for calculating "net equity." In addition, if the Trustee had permitted the objecting claimants to recover based on their final account statements, this would have "affect[ed] the limited amount available for distribution from the customer

28

property fund." [In re BLMIS], 424 B.R. at 133. The inequitable consequence of
such a scheme would be that those who had already withdrawn cash deriving
from imaginary profits in excess of their initial investment would derive
additional benefit at the expense of those customers who had not withdrawn funds
before the fraud was exposed. Because of these facts, the Net Investment Method
better measures "net equity," as statutorily defined, than does the Last Statement
Method. As the bankruptcy court reasoned, "[t]he Net Investment Method is
appropriate because it relies solely on unmanipulated withdrawals and deposits
and refuses to permit Madoff to arbitrarily decide who wins and who loses." [Id.]
at 140.

In re BLMIS I, 654 F.3d at 238 (footnote omitted). In affirming the bankruptcy court's

decision, the Second Circuit found that to use the "Last Statement Method in this case would

have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and

would give legal effect to Madoff's machinations." Id. at 235. The same logic applies with

equal force here.

> The two-year limitation on fraudulent transfer claw backs reflected in 11 U.S.C.

§ 548(a)(1)(A) of the Bankruptcy Code does not alter this conclusion. The limitation period

merely reflects a legislative determination that – at the two-year mark – the need for finality

trumps equitable considerations:

[I]in enacting the Bankruptcy Code, Congress struck careful balances between the
need for an equitable result for the debtor and its creditors, and the need for
finality. See In re Century Brass Prods., Inc., 22 F.3d 37, 40 (2d Cir. 1994). For
example, a bankruptcy trustee can recover fraudulent transfers under § 548(a)(1)
only when the transfers took place within two years of the petition date. And
avoidance claims must be brought "two years after the entry of the order for
relief" at the latest. 11 U.S.C. § 546(a). These statutes of limitations reflect that,
at a certain point, the need for finality is paramount even in light of countervailing
equity considerations. Similarly, by enacting § 546(e), Congress provided that,
for a very broad range of securities-related transfers, the interest in finality is
sufficiently important that they cannot be avoided by a bankruptcy trustee at all,
except as actual fraudulent transfers under § 548(a)(1)(A). We are obliged to
respect the balance Congress struck among these complex competing
considerations.

In re BLMIS II, 773 F.3d at 423. In ruling that the BMIS trustee could not recover fictitious

profits Madoff customers withdrew more than two years before the petition date, however, the

Second Circuit nevertheless acknowledged that Madoff's payments to customers constituted fraudulent transfers. See, e.g., id. at 422 ("Certainly SIPC and the [t]rustee are correct that these transfers were also made 'in connection with' a Ponzi scheme and, as a result, were fraudulent.").

In sum, the Second Circuit's determination that the two-year limit on claw backs of fraudulent transfers operates to protect Madoff investors who withdrew their profits more than two years before the petition date does not mean that Madoff victims who did not withdraw their profits have a legal entitlement to the fictitious profits reflected in their account statements. None of the finality concerns at issue in In re BLMIS II are at issue here. Plaintiff could have – but did not – withdraw its Madoff account's stated value of $36,629,757 in December 1998. To give force to Plaintiff's December 1998 Madoff account statement now would lead to "the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machination." In re BLMIS I, 654 F. 3d at 238. Plaintiff may not recover the $31 million in fictitious profits it seeks in this action.[5] See In re Churchill Mortg.

---

[5] Plaintiff acknowledges that there are "decisions that have held that the victim of a Ponzi scheme cannot collect false profits." (Pltf. Br. (Dkt. No. 34) at 21) Plaintiff argues, however, that these cases have involved claims asserted by victims against the Ponzi organizer or the bankruptcy estate, as opposed to a third party. (Id.) Because this case involves claims against third parties, Plaintiff contends that the decisions holding that a Ponzi scheme victim cannot recover fictitious profits "are completely irrelevant." (Pltf. Br. (Dkt. No. 34) at 21) Plaintiff cites no case law suggesting that a different rule applies in cases involving third parties, however. The one case cited by Plaintiff – Visconsi v. Lehman Bros., Inc., 244 Fed App'x 708 (6th Cir. 2007) – a summary order from the Sixth Circuit – is not on point.

In Visconsi, the Sixth Circuit affirmed a district court decision denying a motion to vacate an arbitration award against Lehman Brothers. Lehman Brothers was not a third party to the fraud. Instead, Lehman employed the broker who was committing fraud. Id. at 709. Moreover, neither the arbitrators nor the courts that refused to vacate the award held that the victim was entitled to recover the $37.9 million reflected in the phony account statements issued by the broker. Id. at 710-11. The arbitrator, without explanation, had awarded $10.4 million, and the relationship between that figure and the $37.9 million reflected in the account statements is

Inv. Corp., 256 B.R. 664, 682 (Bankr. S.D.N.Y. 2000), aff'd sub nom. Balaber-Strauss v.

Lawrence, 264 B.R. 303 (S.D.N.Y. 2001) (there is a "universally-accepted rule that investors

may retain distributions from an entity engaged in a Ponzi scheme to the extent of their

investments, while distributions exceeding their investments constitute fraudulent conveyances

which may be recovered by the [t]rustee").[6]

*     *     *     *

Plaintiff has a legal entitlement to its net investment of $5,725,258. See In re

BLMIS I, 654 F.3d 229 (2d Cir. 2011). However, Plaintiff withdrew $32,974,742 in profits

from its Madoff investment (see Madoff Transaction Table (Dkt. No. 33) at 5), none of which

may be clawed back by the BMIS trustee. (Pltf. Ltr. (Dkt. No. 39); Def. Ltr. (Dkt. No. 38))

Under these circumstances, this Court finds that Plaintiff has suffered no legally cognizable

---

entirely unclear. Id. at 711-12. Finally, the Sixth Circuit appears to have held that the plaintiff
was entitled to "benefit of the bargain" damages under a breach of contract theory. Id. at 713-
14. There is no breach of contract claim here.

[6] There is no claim here that Plaintiff took "for value" within the meaning of 11 U.S.C. §
548(c). Courts have, of course, routinely rejected the argument that a Ponzi scheme investor
has taken fictitious profits "for value." See In re BLMIS, 454 B.R. 317, 333 (Bankr. S.D.N.Y.
2011) ("Courts have consistently held that transfers received in a Ponzi scheme in excess of an
investor's principal are not transferred for reasonably equivalent value."); Sec. Investor Prot.
Corp. v. BLMIS, 476 B.R. at 725 ("an investor's profits from a Ponzi scheme, whether paper
profits or actual transfers, are not 'for value'") (citing Donnell v. Kowell, 533 F.3d 762, 771-72
(9th Cir. 2008)); Armstrong v. Collins, No. 01 Civ. 2437 (PAC), 2010 WL 1141158, at *22
(S.D.N.Y. Mar. 24, 2010) ("By 'investing' in a Ponzi scheme run by the debtor, even
unwittingly, a person does not – strictly speaking – provide 'value.'"); see also
Scholes v. Lehmann, 56 F.3d 750, 757 (7th Cir. 1995) ("[A Ponzi scheme investor] is entitled to
his profit only if the payment of that profit to him, which reduced the net assets of the estate
now administered by the receiver, was offset by an equivalent benefit to the estate. In re
Independent Clearing House Co., 77 B.R. 843, 857-59 (D. Utah 1987). It was not. A profit is
not offset by anything; it is the residuum of income that remains when costs are netted against
revenues. The paying out of profits to [an investor] not offset by further investments by him
conferred no benefit on the [Ponzi scheme] but merely depleted [its] resources faster.").

31

loss.[7]  Accordingly, the alleged loss in Plaintiff's Madoff investment does not provide a basis either for Article III standing or an ERISA breach of fiduciary duty claim.

## B.     Plaintiff's Claim for Advisory and Performance Fees and Legal Expenses

Plaintiff argues that as a result of Ivy's fiduciary breach, the Plan's assets were depleted "due to expenditures of . . . assets that would not have occurred if the Madoff [i]nvestment was no longer part of the [Plan's] overall portfolio." (Pltf. Br. (Dkt. No. 34) at 24) These expenses include (1) advisory and performance fees paid to Ivy; (2) legal fees associated with defending against the BMIS trustee's claw back action; and (3) fees associated with responding to subpoenas. (Id.)

Plaintiff alleges that if Defendants had not breached their fiduciary duty in December 1998 – by failing to disclose what they knew about Madoff's purported trading strategy and that continued investment with Madoff was not prudent – the Trustees would have liquidated the Plan's Madoff account. Accordingly, any advisory and performance fees paid to the Defendants that were derived from the Madoff investment would have also terminated at

---

[7]  Typically, the "measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned on the [breach-causing] investment with what the Plan would have earned had the funds been available for other Plan purposes." Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir. 1985). The instant case involves fictitious profits derived from an "investment" that turned out to be a Ponzi scheme, however, and not – as in Donovan – a real investment with real investment returns and real profits. Moreover, Plaintiff has not argued that this Court should compare the amount it could have earned by placing its $5,725,258 of net equity in an alternative investment with the $32,974,742 in profits it ultimately made from the Madoff investment. Nor has Plaintiff alleged what alternative investments were available to it or the rates of return on any such investments. See Donovan, 754 F.2d at 1056 ("In determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that the funds would have been treated like other funds being invested during the same period in proper transactions."). Beyond claiming that it is entitled to the full stated value of its Madoff account as of December 1998 (Pltf. Br. (Dkt. No. 34) at 10) – a contention that this Court has rejected – Plaintiff has not alleged the proper starting point for a comparison of the Madoff investment with an alternative investment, and therefore has not provided any formula for determining loss.

that time. (Pltf. Br. (Dkt. No. 34) at 25-26)  Moreover, "there would not have been a Madoff [i]nvestment from which withdrawals could have been made and hence there would not have been a basis for a claw back action." (Pltf. Br. (Dkt. No. 34) at 26 (citing Am. Cmplt. (Dkt. No. 29) ¶ 156))  Finally, Plaintiff contends that it would not have had to contend with subpoenas from DOL and the New York Attorney General's Office if the Trustees had liquidated the Plan's Madoff investment in December 1998. (Am. Cmplt. (Dkt. No. 29) ¶¶ 169, 181, 194; see also Pltf. Br. (Dkt. No. 24) at 26-27)

"[F]iduciary duties draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment." Howe, 516 U.S. at 496 (citing Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc., 472 U.S. 559, 570 (1985)).  Under the Restatement (Second) of Trusts, § 213,

> [a] trustee who is liable for a loss occasioned by one breach of trust cannot reduce the amount of his liability by deducting the amount of a gain which has accrued through another and distinct breach of trust; but if the two breaches of trust are not distinct, the trustee is accountable only for the net gain or chargeable only with the net loss resulting therefrom.

Restatement (Second) of Trusts § 213 (1959).  "While 'a fiduciary may not balance losses attributable to a breach of trust against gains attributable to actions which do not involve a breach of trust,' there may be some instances in which net loss is the appropriate measurement." In re Beacon Assocs. Litig., No. 09 Civ. 777 (LBS) (AJP), 2011 WL 3586129, at *6 (S.D.N.Y. Aug. 11, 2011) (quoting Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co., 259 F.3d 1036, 1047 (9th Cir. 2001) (emphasis in Cal. Ironworkers) (citing Restatement (Second) of Trusts § 213, Comment c. (1959))) (internal quotation marks omitted); see also Cal. Ironworkers, 259 F.3d at 1047 ("a fiduciary is liable for the total aggregate loss of all breaches of trust and may reduce liability for the net loss of multiple breaches only when such multiple

33

breaches are so related that they do not constitute separate and distinct breaches"); Donovan, 754 F.2d at 1053 n.5 (deducting profit from the plaintiffs' overpayment of stock and lost investment income to determine net loss).

Here, Plaintiff alleges that Defendants breached their fiduciary duties by failing to disclose what they had discovered about Madoff's purported trading strategy and by failing to inform the Trustees that it was not prudent to continue the investment with Madoff. Plaintiff therefore does not claim that Defendants engaged in separate breaches that resulted in separate damages to the Plan. See, e.g., Taylor v. KeyCorp, 680 F.3d 609, 615 (6th Cir. 2012) (finding that plaintiff did not allege separate breaches where plaintiff asserted that defendants concealed or misrepresented information that affected stock price). Accordingly, Defendants' liability for any unnecessary expenses borne by the Plan as a result of their fiduciary breaches may be netted against any of the Plan's gains resulting from the same breach. See Cal. Ironworkers, 259 F.3d at 1047. Because of the huge gain Plaintiff realized from its Madoff investment, Plaintiff has not demonstrated that it suffered any loss as a result of fees paid to Ivy or legal expenses associated with the claw back action or the subpoenas. See id. (plaintiff did not have standing where it suffered no net loss as a result of defendants' fiduciary breach).

C.     **Plaintiff's Claim for Increased Pension Benefits**

Plaintiff asserts that if Defendants had disclosed that they had concluded that a continued investment with Madoff was not prudent, the Plan would have terminated its Madoff investment and would not have increased Plan participants' pension benefits. (Pltf. Br. (Dkt. No. 34) at 24-25) Because the Plan incurred additional costs as a result of the increase in pension benefits, Plaintiff claims that it suffered a loss from Defendants' breach. See Am.

34

Cmplt. (Dkt. No. 29) ¶ 99 ("These amendments increased the Plan's costs by providing increased future benefits and additional accrued benefits to participants in the Plan.").

Plaintiff cites Gruby v. Brady, 838 F. Supp. 820 (S.D.N.Y. 1993), for the proposition that "the payment of benefits at artificially high levels constitutes a loss to the plan and is compensable under ERISA." (Pltf. Br. (Dkt. No. 34) at 25)  In Gruby, Defendant trustees recommended to pension fund participants that monthly pension benefits be increased, assuring plan participants that the increases were "prudent and financially responsible." Gruby, 838 F. Supp. at 824. After the increases, however, plaintiffs were told that the pension fund was experiencing serious financial difficulties, and that absent a reduction in the monthly pension benefit level or a substantial increase in the return of capital, the fund's assets would be depleted. Id. at 824-25. Plaintiffs alleged that the defendant trustees' failure to monitor the financial condition of the pension fund and ensure that the benefits paid were not excessive constituted a fiduciary breach. Id. at 829.

Here, Plaintiff does not allege that Defendants advised Plaintiff to increase pension benefit payments. "As [the Second Circuit] has observed, 'a person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only "to the extent" that he has or exercises the described authority or responsibility.'" Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d 18, 28 (2d Cir. 2002) (quoting F.H. Krear & Co. v. Nineteen Named Trs., 810 F.2d 1250, 1259 (2d Cir. 1987)); see also Coulter v. Morgan Stanley & Co., 753 F.3d 361, 366 (2d Cir. 2014) ("'In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.'") (quoting Pegram, 530 U.S. at 226) (citing 29 U.S.C. §§ 1002(21)(A), 1109).  Given that there is no

35

allegation that Ivy, Simon, and Wohl had any involvement – let alone performed a fiduciary role – in the Plan's decision to increase pension benefits, any increase that the Trustees made in pension benefits does not implicate Defendants' fiduciary duties under ERISA.

The Trustees' decision to increase pension benefit payments under the Plan does not constitute a legally cognizable loss.

\*       \*       \*       \*

Plaintiff has alleged no legally cognizable loss. Accordingly, Plaintiff cannot rely on the argument that Defendants Ivy, Simon, and Wohl caused losses to the Plan in order to establish Article III standing or an ERISA breach of fiduciary duty claim. To the extent that Counts I, II, and III of the Amended Complaint are founded on allegations that Defendants Ivy, Simon, and Wohl caused losses to the Plan, those claims must be dismissed.

## III. PLAINTIFF'S CLAIM FOR DISGORGEMENT

In the Amended Complaint, Plaintiff claims that it is entitled to "disgorgement of any profits earned by Defendants Wohl and Simon stemming from the placing of the Plan's assets at risk for their personal benefit and the breaches of fiduciary duty alleged herein." (Am. Cmplt. (Dkt. No. 29) (ad damnum clauses) at 28, 31, 35; see also id. ¶¶ 170, 182, 195) Plaintiff seeks, in particular, recovery of the entire \$200 million that Simon and Wohl received in connection with the Bank's acquisition of Ivy.[8] (Am. Cmplt. (Dkt. No. 29) ¶¶ 170, 182, 195)

---

[8] Counts I, II, and III of the Amended Complaint seek disgorgement from Simon and Wohl, but not from Ivy. (Am. Cmplt. (Dkt. No. 29) (ad damnum clauses) at 28, 31, 35) Given that Ivy – and not Simon and Wohl individually – was paid advisory and performance fees (see Am. Cmplt. (Dkt. No. 29) ¶¶ 26, 41, 105, 122, 130, 144, 148; id., Ex. 1 at 9), this Court does not read these counts as seeking disgorgement of advisory and performance fees paid to Ivy. Count IV of the Amended Complaint purports to seek "disgorgement of all investment advisory fees paid by Plaintiff to Ivy\BONY," but Count IV is brought solely against the Bank. (Am. Cmplt. (Dkt. No. 29) at 37)

36

Plaintiff contends that Simon and Wohl "plac[ed] the Plan's assets at risk for their own benefit" (id. ¶ 110) when they did not fully disclose all of their concerns about Madoff to the Trustees. (Id. ¶¶ 102-106) According to Plaintiff, Simon and Wohl did not disclose their concerns about Madoff's trading strategy because they wanted the Plan to continue its investment with Madoff, because this would help ensure that the Bank's acquisition of Ivy would proceed. See id. ¶¶ 107-115.

## A.     Applicable Law

Section 409 of ERISA, 29 U.S.C. § 1109(a), provides that

> [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary. . . .

29 U.S.C. § 1109(a) (emphasis added).

Disgorgement may be appropriate where a plan fiduciary has put a plan's assets at risk – not for the exclusive benefit of plan participants – but at least in part to serve the fiduciary's personal interest. See Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock, 861 F.2d 1406, 1408 (9th Cir. 1988) (finding disgorgement remedy appropriate where "plan assets were invested and held and thereby put at risk not for the exclusive benefit of the Plan's participants and beneficiaries . . . but for the benefit of one of the fiduciaries" (emphasis, quotation marks, and alterations omitted)). In such circumstances, a plan may recover "any profits of such fiduciary which have been made through [the improper] use of assets of the plan by the fiduciary." 29 U.S.C. 1109(a). An ERISA plaintiff must plead facts showing a causal connection between a fiduciary's improper use of plan assets and profits made by the fiduciary, however. Leigh v. Engle, 727 F.2d 113, 137 (7th Cir. 1984) ("[Section] 1109

37

permits recovery of a fiduciary's profits only where there is a causal connection between the use

of the plan assets and the profits made by fiduciaries"; remanding to district court for

determination of whether defendants' profits were attributable to their use of plan assets). An

ERISA plan need not demonstrate that it suffered a loss in order to obtain a disgorgement

remedy. See Murdock, 861 F.2d at 1412 (immaterial whether beneficiaries actually lost money

as a result of the fiduciaries' breach); Leigh, 727 F.2d at 122 ("The nature of the breach of

fiduciary duty alleged here is not the loss of plan assets but instead the risking of the trust's

assets at least in part to aid the defendants in their acquisition program.") (emphasis in original).

       The Ninth Circuit has summarized the purpose of the disgorgement remedy as

follows:

> [T]he purpose behind th[e] [disgorgement of profits] rule is to deter the fiduciary
> from engaging in disloyal conduct by denying him the profits of his breach. G.
> Bogert and G. Bogert, The Law of Trusts and Trustees § 543, at 218 (2d ed.
> 1978). If there is no financial incentive to breach, a fiduciary will be less
> tempted to engage in disloyal transactions. Id. The purpose of the rule is not to
> make beneficiaries whole for any damages they may have suffered. In fact,
> whether beneficiaries have been financially damaged by the breach is immaterial.
> [Id.] at 217. Rather, the objective is to make "disobedience of the trustee to the
> [duty of loyalty] so prejudicial to him that he and all other trustees will be
> induced to avoid disloyal transactions in the future." Id. at 218.

Murdock, 861 F.2d at 1411-12.

## B.    Analysis

       In order to make out a claim for disgorgement here, Plaintiff must plead facts

demonstrating that it is plausible to believe that (1) Simon and Wohl induced the Trustees to

leave Plan assets with Madoff in order to help ensure that the Bank's acquisition of Ivy would

be consummated; and (2) that Simon and Wohl would not have received some portion of their

$200 million payout had they disclosed their concerns about the Madoff investment to the

Trustees. Stated another way, Plaintiff must plead facts making it plausible to believe that

Simon and Wohl derived some amount of additional profit by not disclosing to the Trustees their concerns regarding Madoff's trading strategy.

Here, the Amended Complaint pleads facts demonstrating that Simon and Wohl were concerned about the effect on Ivy's fees and assets under management if they recommended to clients that their Madoff investments be terminated. In a December 16, 1998 email to Simon and other senior Ivy executives, Wohl reports that he is troubled by Madoff's conflicting accounts regarding his trading strategy, and he states that continued investment in Madoff cannot be justified by blind faith "based on great performance." (Am. Cmplt. (Dkt. No. 29), Ex. 3 and ¶ 71). Simon responds that Ivy's proprietary funds' investments with Madoff are not substantial, but that the "bigger issue is the $190 mill[ion] or so that our [clients] have with [Madoff]." (Id., Ex. 4 and ¶ 73) Simon goes on to write:

> Are we prepared to take all the chips off the table, have assets decrease by over $300 million and our overall fees reduced by $1.6 million or more, and, one wonders if we ever "escape" the legal issue of being the asset allocator and introducer, even if we terminate all Madoff related relationships?

(Id.)

The Amended Complaint also alleges that

> Defendants Simon and Wohl knew and understood that if Ivy's assets under management stemming from those clients were reduced because of full and complete disclosure of Ivy's conclusion that a continued investment in the Madoff Investment had become imprudent, Ivy's value on the open market would substantially decrease which would result in a reduction in their anticipated payout.

(Id. ¶ 109)

It is not clear from the Amended Complaint whether Simon and Wohl's discussions about disclosing to clients their concerns about Madoff's trading strategy were taking place at the same time Simon and Wohl were negotiating with the Bank about an

39

acquisition of Ivy. See id. ¶ 197 ("negotiations that preceded BONY's acquisition of Ivy lasted approximately thirteen months"); id. ¶ 201 (the Bank acquired Ivy some time in 2000); id. ¶ 107 (At some point "[i]n the year 2000 . . . Ivy itself had become an acquisition target of defendant BONY."). Because no date for the Ivy acquisition is specified in the Amended Complaint, it is not possible to determine whether Simon and Wohl's December 1998 communications about Madoff were taking place during the time that negotiations regarding the Ivy acquisition were ongoing.

However, given the Amended Complaint's allegations that (1) in December 1998 Simon and Wohl feared a $300 million drop in assets under management if they disclosed their concerns about Madoff's trading strategy to clients; (2) the Ivy acquisition took place at some point in 2000, and was preceded by thirteen months of negotiations; and (3) Ivy began sharing its concerns about Madoff with clients in 2001, after the Bank's acquisition of Ivy was complete, this Court will assume – for purposes of resolving Defendants' motion – that Plaintiff has pled sufficient facts to make it plausible to believe that Simon and Wohl did not share their suspicions about Madoff's trading strategy with the Trustees because of concerns that such a disclosure could somehow derail the Bank's acquisition of Ivy.

Plaintiff has not alleged, however, that had Simon and Wohl fully disclosed their concerns about Madoff, the Trustees would, in fact, have withdrawn some or all of the Plan assets under Ivy's management. Plaintiff alleges only that "[h]ad Ivy informed the then Trustees of all of the concerns and facts known to Ivy about the Madoff Investment, . . . the then Trustees would not have had a position in the Madoff Investment . . . ." (Am. Cmplt. (Dkt. No. 29) ¶ 123) The Amended Complaint does not assert that Plaintiff would have removed Ivy as

40

its investment adviser or withdrawn any portion of Plan assets that were under Ivy's management.

The absence of any allegation that Plaintiff would have withdrawn its assets from Ivy's management is fatal to Plaintiff's disgorgement claim. Plaintiff has alleged that the Bank "was interested in Ivy because of its roster of high net worth individual investors and its ERISA covered employee benefit plan client base." (Id. ¶ 108) Plaintiff has also alleged that "if Ivy's assets under management stemming from those clients were reduced . . . Ivy's value on the open market would substantially decrease." (Id. ¶ 109) But given that Plaintiff has not alleged that it would have terminated its relationship with Ivy – or withdrawn a portion of the Plan assets under Ivy's management – in the event Simon and Wohl had made full disclosure about Madoff, Plaintiff has not demonstrated that that disclosure would have negatively affected Ivy's assets under management or related fees.

Moreover, the Amended Complaint does not plead facts suggesting that Ivy's placement of its clients' assets with Madoff factored into the price the Bank was willing to pay to acquire Ivy. Indeed, the Amended Complaint states that Ivy informed the Bank of its concerns about Madoff. (Id. ¶ 113 (Madoff investment concerns "had been withheld from the then Trustees but provided to [the Bank]"); see id. ¶ 199 (Ivy informed the Bank it intended to liquidate its Madoff investment))

In sum, to demonstrate that Simon and Wohl would not have garnered $200 million in profit from the Bank's acquisition of Ivy had they fully disclosed their concerns about Madoff to Plaintiff, it is not sufficient for Plaintiff to plead simply that it would have terminated its Madoff investment. Instead, Plaintiff must allege facts demonstrating that it would have withdrawn some portion of Plan assets from Ivy's management. Absent such allegations, there

41

is no reason to believe that fuller disclosure about Madoff would have negatively affected Ivy's

assets under management or fees, and thus its acquisition price. Because Plaintiff has not made

such allegations, it has not plausibly demonstrated that Simon and Wohl's alleged improper use

of Plan assets generated profits beyond what they would otherwise have made. See Leigh, 727

F.2d at 137 ("[Section] 1109 permits recovery of a fiduciary's profits only where there is a

causal connection between the use of the plan assets and the profits made by fiduciaries";

remanding to district court for determination of whether defendants' profits were attributable to

their use of plaintiffs' assets). The disgorgement claim will be dismissed.

## IV.    PLAINTIFF'S CLAIM AGAINST THE BANK

In Count IV of the Amended Complaint, Plaintiff contends that the Bank – a

non-fiduciary to the Plan – knowingly participated in Ivy, Simon, and Wohl's alleged breach of

fiduciary duty. (Am. Cmplt. (Dkt. No. 29) ¶¶ 196-209) The Bank has moved to dismiss Count

IV for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (Def. Br. (Dkt. No. 33) at 26-28)

The Second Circuit has recognized "the principle that parties who knowingly

participate in fiduciary breaches may be liable under ERISA to the same extent as the

fiduciaries." Lowen v. Tower Asset Mgmt., Inc., 829 F.2d 1209, 1220 (2d Cir. 1987) (citing

Thornton v. Evans, 692 F.2d 1064, 1077-78 (7th Cir. 1982); Donovan v. Daugherty, 550 F.

Supp. 390, 410-11 (S.D. Ala. 1982)) (parentheticals omitted). The court has noted that

> [a]uthority for recovery against non-fiduciaries is derived from trust law
> principles, upon which ERISA is based, see Freund v. Marshall & Ilsley Bank,
> 485 F. Supp. 629, 641-42 (W.D. Wis. 1979), and on ERISA's remedial
> provisions, which entitle plaintiffs:
>
>> (A) to enjoin any act or practice which violates any provision of
>> [Title I of ERISA] or the terms of the plan, or (B) to obtain other
>> appropriate equitable relief (i) to redress such violations or (ii) to
>> enforce any provision of [Title I] or the terms of the plan. 29
>> U.S.C. § 1132(a)(3).

Id.

"The well-settled elements of a cause of action for participation in a breach of fiduciary duty are (1) breach by a fiduciary of a duty owed to plaintiff, (2) defendant's knowing participation in the breach, and (3) damages." Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 281-82 (2d Cir. 1992), abrogated on other grounds by Gerosa v. Savasta & Co., 329 F.3d 317 (2d Cir. 2003) (citing S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847-48 (2d Cir. 1987)). "The knowledge element of this cause of action can be broken down into two elements, namely (1) knowledge of the primary violator's status as a fiduciary; and (2) knowledge that the primary's conduct contravenes a fiduciary duty." Gruby, 838 F. Supp. at 835 (citing Diduck, 974 F.2d at 282-83). With respect to the second element, "constructive knowledge suffices." Diduck, 974 F.2d at 283. "A defendant who is on notice that conduct violates a fiduciary duty is chargeable with constructive knowledge of the breach if a reasonably diligent investigation would have revealed the breach." Id. "One participates in a fiduciary's breach if he or she affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables it to proceed." Id. at 284.

Here, the allegations in the Amended Complaint are sufficient to satisfy the knowledge element. Plaintiff alleges that "[u]pon its acquisition of Ivy in 2000, or thereafter," the Bank was informed of the suspicious facts and circumstances concerning Madoff's trading strategy, and learned "that Ivy was instructing clients other than the Plan to divest themselves of their Madoff investment and was telling new clients that it could not place the new clients' assets with Madoff consistent with Ivy fiduciary responsibilities." (Am. Cmplt. (Dkt. No. 29) ¶ 202) The Amended Complaint also alleges that – after the acquisition – the Bank formed an internal committee to assess Ivy's business risks and determined that Ivy's Madoff investments

43

were its fourth highest risk in 2005, and one of its top risks in 2007.  (Id. ¶¶ 203, 204, 206)  See Gruby, 838 F. Supp. at 835 (allegations sufficient to establish knowledge element where plaintiff alleged that defendant – a consultant to the pension fund – consulted with the breaching fiduciaries of the pension fund, and was solicited by the breaching fiduciaries for advice regarding the pension fund).

The Amended Complaint does not allege facts creating a plausible inference that the Bank participated in Ivy's fiduciary breach, however.  Plaintiff simply alleges that "[b]y virtue of its acquiescence and its receipt of the investment advisory fees paid by the Plan, Defendant BONY became a knowing participant in [its co-defendants'] fiduciary breach. . . ." (Am. Cmplt. (Dkt. No. 29) ¶ 209)  Plaintiff cites no law suggesting that knowledge combined with receipt of advisory fees is sufficient to state a claim for knowing participation in the fiduciary breach of another.  To the contrary, case law indicates that Plaintiff must plead facts demonstrating that the Bank "acted . . . [to] caus[e] the prohibited investment," Lowen, 829 F.2d at 1220, or that it "affirmatively assist[ed], help[ed] conceal, or by virtue of failing to act when required to do so enable[d] [the fiduciary breach] to proceed." Diduck, 974 F.2d at 284; see also Lowen, 829 F.2d at 1220 (holding that defendants were liable for participating in another's fiduciary breach where they "acted in concert with the [investment manager fiduciary] in causing the prohibited investments").  Here, Plaintiff has not pled facts showing that the

Bank played an affirmative role in its co-defendants' alleged fiduciary breach.[9]  Accordingly,

Plaintiff's claim against the Bank of New York Mellon will be dismissed.[10]

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted.  The

Clerk of the Court is directed to terminate the motion (Dkt. No. 31).  Any motion for leave to

file a Second Amended Complaint shall be filed within 30 days of this Order.

Dated: New York, New York
        September 16, 2015

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[9]  Phones Plus, Inc. v. The Hartford Fin. Servs. Grp., Inc., No. 06 Civ. 01835 (AVC), 2007 WL 3124733 (D. Conn. Oct. 23, 2007), cited by Plaintiff (Pltf. Br. (Dkt. No. 34) at 33), is not on point. All the defendants in that case were plan fiduciaries. Phones Plus, 2007 WL 3124733, at *4-6. Here, Plaintiff does not contend that the Bank is a Plan fiduciary, see Pltf. Br. (Dkt. No. 34) at 32, and Plaintiff's theory is that the Bank participated in the fiduciary breach of another. (Am. Cmplt. (Dkt. No. 29) at 35)

[10]  Plaintiff must also plead facts demonstrating that it suffered damages as a result of the Bank's participation in its co-defendants' fiduciary breach. Diduck, 974 F.2d at 281-82. Although Plaintiff alleges that it paid fees to the Bank that relate to the Plan's Madoff investment (Am. Cmplt. (Dkt. No. 29) ¶¶ 201, 209), this allegation is not sufficient to establish that Plaintiff suffered damages. As discussed above in connection with Ivy's fees, any fees Plaintiff paid to the Bank are dwarfed by the huge profit the Plan realized from the Madoff investment. Because Plaintiff has not alleged facts sufficient to show that it suffered damages as a result of the Bank's alleged participation in its co-defendants' breach of fiduciary duty, Plaintiff's claim against the Bank fails for this reason as well.

45